JOHN CATALANO AND RUTH CATALANO, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos:                                             Filed July 7, 1983.

| 2506–80, | 2878–80, | 4885–80, | 4886–80, | 4976–80, | 4977–80, |
|---|---|---|---|---|---|
| 4978–80, | 4979–80, | 4981–80, | 4982–80, | 4983–80, | 4984–80, |
| 4985–80, | 4986–80, | 4987–80, | 4988–80, | 4989–80, | 4990–80, |
| 5265–80, | 5266–80, | 5267–80, | 5721–80, | 5722–80, | 5723–80, |
| 5724–80, | 5725–80, | 5726–80, | 5727–80, | 5729–80, | 5730–80, |
| 5732–80, | 5733–80, | 5734–80, | 5735–80, | 5736–80, | 5738–80, |
| 6404–80, | 7260–80, | 7261–80, | 7262–80, | 7263–80, | 7264–80, |
| 7265–80, | 7266–80, | 7267–80, | 7268–80, | 7269–80, | 7270–80, |
| 7272–80, | 7273–80, | 7274–80, | 7275–80, | 7276–80, | 7277–80, |
| 7278–80, | 7279–80, | 7280–80, | 7281–80, | 7282–80, | 7283–80, |
| 7284–80, | 7285–80, | 7286–80, | 7287–80, | 7288–80, | 7289–80, |
| 7290–80, | 7291–80, | 7292–80, | 7294–80, | 7295–80, | 7296–80, |
| 7297–80, | 7411–80, | 7413–80, | 7414–80, | 7891–80, | 7892–80, |
| 7893–80, | 7894–80, | 7895–80, | 7896–80, | 7897–80, | 7898–80, |
| 8327–80, | 8328–80, | 8329–80, | 8384–80, | 8991–80, | 9096–80, |
| 9097–80, | 9562–80, | 9563–80, | 10529–80, | 10530–80, | 10532–80, |
| 11109–80, | 11516–80, | 12185–80, | 12186–80, | 14302–80, | 14733–80, |
| 14734–80, | 16000–80, | 16304–80, | 17451–80, | 17900–80, | 18464–80, |
| 21889–80, | 4480–81, | 2690–82, | 8828–82. | | |

---

[13]Respondent conceded on brief that Mr. Anthes is not liable for this excise tax.

[1]Cases of the following petitioners are consolidated herewith: Bernard Ritter and Elisabeth Ritter, docket No. 2878–80; Edward A. Borla and Catherine L. Borla, docket No. 4885–80; Michael Vern Menzelli, docket No. 4886–80; David J. Zderic, docket No. 4976–80; Don Tell and Rita Tell, docket No. 4977–80; Gerd Sternberg and Noreen Sternberg, docket No. 4978–80; Cornelius Smyth and Celia Smyth, docket No. 4979–80; William R. Libert,

*John D. Gubler,* for the petitioner in docket No. 6404–80.
*Jerome L. Blut,* for the petitioners in docket Nos. 8384–80, 12185–80, 12186–80, 14733–80, and 14734–80.
David H. Lum, pro se in docket No. 8991–80.

---

docket No. 4981–80; Harry J. Krause and Helen Krause, docket No. 4982–80; Richard Knoll and Michelle Knoll, docket No. 4983–80; Robert Hirsh and Laverne Hirsh, docket No. 4984–80; Ricardo A. Fonte, docket No. 4985–80; Enrique Fonte and Hilda Fonte, docket No. 4986–80; John H. Cameron and Mary Cameron, docket No. 4987–80; Paul F. Bartolo and Judy Bartolo, docket No. 4988–80; Arthur L. Baez, docket No. 4989–80; Nick Nixon, docket No. 4990–80; Theodore Gagliano, Jr., and Ami S. Gagliano, docket No. 5265–80; Joseph F. D'Ambrosio and Marian E. D'Ambrosio, docket No. 5266–80; Ledell Fortune and Mary J. Fortune, docket No. 5267–80; George Belch and Kathleen Belch, docket No. 5721–80; Francisco A. Gonzalez, docket No. 5722–80; Miguel Garcia and Nereida M. Garcia, docket No. 5723–80; Roberto Chao and Graciela D. Chao, docket No. 5724–80; Joseph A. Cap and Virginia A. Cap, docket No. 5725–80; Diosa Costello, docket No. 5726–80; Charles E. Gonzales and Emma L. Gonzales, docket No. 5727–80; Antonio F. Galvez, docket No. 5729–80; Edwin H. Holzman, docket No. 5730–80; Pablo Godinez and Ceferina B. Godinez, docket No. 5732–80; Octavio Escudero and Angela Escudero, docket No. 5733–80; Tony Farao, docket No. 5734–80; Chin Bing Foo, docket No. 5735–80; Patrick Desantes and Marion Desantes, docket No. 5736–80; David A. Cox and Kathy P. Cox, docket No. 5738–80; Lawrence A. Griffin and Marjorie R. Griffin, docket No. 6404–80; Frank James Caserta, docket No. 7260–80; Vincent A. Costantino and Rita M. Costantino, docket No. 7261–80; Park T. Lew, docket No. 7262–80; Willie E. Kline and Freddie Mae Kline, docket No. 7263–80; Kenneth J. McQuaig and Darlene A. McQuaig, docket No. 7264–80; Ira S. Gertz, docket No. 7265–80; Benjamin DeFelice, docket No. 7266–80; Edward Jeffers, docket No. 7267–80; Israel Siegal and Bertha Siegal, docket No. 7268–80; Paul Leichter and Mary Leichter, docket No. 7269–80; Kenneth J. King and Martha H. King, docket No. 7270–80; Evangelos Kairis and Helen Kairis, docket No. 7272–80; Steve W. Jackson and Brenda Jackson, docket No. 7273–80; Joseph Izzo and Carol Izzo, docket No. 7274–80; R. W. Hamlett, docket No. 7275–80; Benny L. Figgins and Shirley Millender Figgins, docket No. 7276–80; Harry D.

Dominic A. Tegano, pro se in docket No. 10530–80.
*Alan R. Harter*, for the petitioners in all remaining dockets.
*Scott N. McCallum* and *Craig D. Platz*, for the respondent.

FAY, *Judge*: In these 112 consolidated cases, respondent determined deficiencies ranging from $197.82 to $5,790.87 in and additions to petitioners' Federal income tax for the years 1976–79.[2] The issues are (1) whether petitioners understated their "toke" income by the amounts determined by respondent, and (2) whether petitioners are liable for additions to tax under section 6653(a)[3] for negligence.

---

Farnow and Kathryn Farnow, docket No. 7277–80; Enrique Sanchez, docket No. 7278–80; Bonifacio H. Sanchez, docket No. 7279–80; Benjamin Quon and Christine Quon, docket No. 7280–80; Julie Pinkerton, docket No. 7281–80; Wayne C. Miracle and Linda Miracle, docket No. 7282–80; John K. Martin and Janis M. Martin, docket No. 7283–80; Michael Martarano and Donna J. Martarano, docket No. 7284–80; Pablo E. Maciques and Olga A. Maciques, docket No. 7285–80; Anatole Lorraine, docket No. 7286–80; Gusavo Padilla and Esther Padilla, docket No. 7287–80; Joseph J. Woods and Eloise L. Woods, docket No. 7288–80; Lee R. Whitney and Linda R. Whitney, docket No. 7289–80; Mechita West, docket No. 7290–80; Richard Weinstein, docket No. 7291–80; Phil Walker, docket No. 7292–80; Alfred Twainy and Lorrie Twainy, docket No. 7294–80; Daryl D. Thompson and Delleen Thompson, docket No. 7295–80; Tree Sirin and Elaine Sirin, docket No. 7296–80; David P. Benoit, docket No. 7297–80; Clyde T. Starr and Denese M. Starr, docket No. 7411–80; Charles C. Rhodes and Lorraine Rhodes, docket No. 7413–80; William Rizzo, docket No. 7414–80; Aleksandar Lazukic and Patricia Lazukic, docket No. 7891–80; Frank Miniaci, docket No. 7892–80; Letha Scharmagne Smith, docket No. 7893–80; Henry S. Kripitz, docket No. 7894–80; Nikolaos Nikolopoulos and Dimitra Nikolopoulos, docket No. 7895–80; Pamela E. Price, docket No. 7896–80; Morris A. Gerges, docket No. 7897–80; John E. Ciccolella and Patricia M. Ciccolella, docket No. 7898–80; Juan Del Prado and Amelia Del Prado, docket No. 8327–80; Olin Gin and Yuet Gin, docket No. 8328–80; Ruth A. Smith, docket No. 8329–80; Charles T. Neville, Jr., docket No. 8384–80; David H. Lum and Sandra L. Lum, docket No. 8991–80; Henry Levy and Marion Levy, docket No. 9096–80; Juan R. Prieto and Carman Prieto, docket No. 9097–80; Ebrahim Hawwass and Juana Hawwass, docket No. 9562–80; Flavio Ostolaza and Mariam Ostolaza, docket No. 9563–80; Stephen R. Flippin, docket No. 10529–80; Dominic A. Tegano and Susan Tegano, docket No. 10530–80; Dave Yovis and Florence Yovis, docket No. 10532–80; Richard D. Minnozzi and Frances Minnozzi, docket No. 11109–80; Benjmin and Shirley Asberry, docket No. 11516–80; Robert D. Faccinto, docket No. 12185–80; Peter A. Michelin, docket No. 12186–80; Lynn C. Slonim, docket No. 14302–80; Rocco J. Paravia and Charla L. Paravia, docket No. 14733–80; Richard C. Romano, docket No. 14734–80; John A. Dunn, docket No. 16000–80; Michael D. and Debra G. Zotti, docket No. 16304–80; Joseph K. Goulding and Lee Goulding, docket No. 17451–80; Vincent S. Verdone and Janice A. Verdone, docket No. 17900–80; George Khoury and Alberta Khoury, docket No. 18464–80; Percy Ealy and Jerry L. Ealy, docket No. 21889–80; Charles E. and Emma L. Gonzales, docket No. 4480–81; Paul Leichter and Mary Leichter, docket No. 2690–82; Joseph F. D'Ambrosio and Marian E. D'Ambrosio, docket No. 8828–82.

[2]In docket No. 4480–81 the year in issue is 1978, and in docket Nos. 2690–82 and 8828–82 the year in issue is 1979. All other dockets involve the years 1976 and/or 1977.

[3]All section references are to the Internal Revenue Code of 1954 as amended.

## FINDINGS OF FACT

Some of the facts are stipulated and found accordingly.

All petitioners resided in Nevada when they filed their petitions herein.

At all relevant times, petitioners[4] were employed as blackjack dealers, roulette dealers, and Big Wheel dealers at Caesar's Palace, a gambling casino in Las Vegas, Nev. In the course of their employment, petitioners received "tokes" from players at the gaming tables.[5] Dealers at the casino participated in a pooling arrangement whereby all tokes were placed in common "toke boxes." At approximately 11 o'clock every morning, selected dealers carried these toke boxes to the dealers' lounge where the chips were counted and arranged in racks according to color. Each rack contained five rows and held 100 chips when full.[6] Black chips, green chips, red chips, and silver chips were worth $100, $25, $5, and $1, respectively.[7] After completing their count, the total cash value of the tokes was recorded on a yellow sheet of paper. Then the racks were placed in a box and taken to the cashier's cage which was located in a public area of the casino. The racks were removed from the box and placed on the counter of the cashier's cage wherein the cashier separated the racks according to color and counted them. If a row was not full, the cashier spread the chips on the counter and separately counted them. Once the cashier completed his count, the chips were cashed in, and the money was subsequently divided between the dealers on the basis of length of shifts during the preceding 24-hour period.

---

[4]The term "petitioners" as used herein does not refer to those petitioners who are parties herein solely by virtue of having filed joint returns.

[5]The term "tokes" is used to describe the casino chips which gaming players give the dealers during the course of play. These chips are convertible into cash.

The dealers received tokes directly from the player or as the result of a player's placing a "bet" for the dealer. If the bet was not successful, the casino received the entire amount of the bet. If the bet was successful, the player was free to give the winning bet to the dealer or keep it for himself.

[6]Examples of the two types of racks used at Caesar's Palace in 1976 and 1977 were presented to the Court for its examination. The wooden rack was used to hold black, green, and red chips. The metal rack was larger and heavier and was designed to hold the larger silver chips.

[7]Caesar's Palace had a strict policy prohibiting dealers from taking black chips from the area of the gaming tables. Thus, dealers exchanged any black chips received as tokes for chips of lower denomination.

In connection with a surveillance project at Caesar's Palace, Internal Revenue Service agents observed the dealers' exchanges of tokes at the cashier's cage on 48 days during the period February 9, 1976, through January 26, 1977. Respondent rotated 13 revenue agents on the project. The revenue agents watched most of these exchanges from a guest telephone located just to the right of the cashier's cage from which they were able to gain an unobstructed view of the exchange. Occasionally, the revenue agents watched from nearby slot machines or from the next cashier's window.[8] Every toke exchange observed by the revenue agents occurred at the far right window of the cage. To avoid detection, the revenue agents either engaged in a conversation on the guest telephone, played the slot machines, or stood in line at the next cashier's window.

The revenue agents were instructed to count only those racks which they were able to identify clearly. If the agent saw a row of chips that was not full, he did not include that row in his count unless he was able to determine the exact number of chips in that row. Frequently, the agents were able to get close enough to the cashier's cage to read the yellow sheet of paper on which was written the total cash value of that day's tokes. The agents recorded these observations on "surveillance memos" immediately after the toke exchanges were completed.

Based on data gathered from the surveillance project, respondent determined that the average daily toke rate for a dealer working at Caesar's Palace was $63.45. Since a daily shift is 8 hours, respondent computed an hourly toke rate of $7.93. Of the 48 days of surveillance, 12 of the days fell on weekends. Days on which special promotional events occurred were also conservatively represented during the 48 surveillance days. All but four of the surveillances took place in 1976.

Petitioners maintained no records from which their toke income could be determined. They merely reported an arbitrary amount of such income on their returns for the years at issue. With one adjustment, respondent reconstructed petitioners' toke income by multiplying the average hourly toke

---

[8]The cashier's cage contained a line of windows separated by narrow panels, much like the configuration of tellers' windows at many banks.

rate which had been determined on the basis of the surveillance data ($7.93) by the number of hours petitioners worked as dealers at Caesar's Palace during the relevant years.[9] Respondent determined that petitioners had unreported toke income to the extent this figure exceeded the amounts reported by petitioners on their returns. Respondent also asserted additions to tax for negligence.

## OPINION

### I. Reconstruction of Toke Income

It is well settled that "tokes" must be included in gross income. *Olk v. United States*, 536 F.2d 876 (9th Cir. 1976). The issue is whether petitioners understated their toke income by the amounts determined by respondent. The burden of proof is on petitioners to overcome the presumption of correctness that attaches to respondent's determinations. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a).[10] Since petitioners failed to maintain records from which their toke income could be accurately determined and the amounts of toke income they reported were merely estimates, respondent was entitled to reconstruct petitioners' toke income using a method which, in his opinion, would clearly reflect that income. *Meneguzzo v. Commissioner*, 43 T.C. 824 (1965).

Respondent has great latitude in adopting a method for reconstructing a taxpayer's income. *Giddio v. Commissioner*, 54 T.C. 1530, 1533 (1970). It is sufficient if the reconstruction is reasonable in light of all the surrounding facts and circumstances. *Schroeder v. Commissioner*, 40 T.C. 30, 33 (1963). Here, petitioners contend the data collected during the surveillance project were unreliable and that there were defects in respondent's statistical analysis of that data. For the following reasons, we reject petitioners' assertions, and we conclude

---

[9]In 1976, there was a culinary workers' strike at Caesar's Palace which lasted 13 days. Although the casino remained open, the volume of gambling diminished during that period. Respondent adjusted his formula to account for this unusual event by reducing by 96 hours the number of hours worked by those petitioners who were employed at Caesar's Palace during the strike.

[10]All Rule references are to the Tax Court Rules of Practice and Procedure.

respondent's determinations were neither arbitrary nor excessive.

We disagree with petitioners' first argument that the revenue agents could not have made accurate counts while observing the toke exchanges from a distance. The exchanges took place in plain view at the cashier's cage located in a public area. The chips were arranged in racks according to their easily identifiable colors. During the exchanges, the racks were placed on the counter of the cashier's cage where they remained for several minutes while the cashier counted them. By standing at the next cashier's window, playing the nearby slot machines, or, in most cases, engaging in a conversation on the guest telephone located just to the right of the cage, the revenue agents were able to observe the exchanges from nearby vantage points. Frequently, the agents were even able to get close enough to the exchanges to read the yellow sheet of paper which had the total cash value of that day's tokes written on it.[11] Based on these circumstances, we are convinced the revenue agents' counts were highly reliable.

Admittedly, respondent's surveillance methods were not foolproof. Petitioners point out that on the few occasions when two revenue agents made simultaneous counts from two different vantage points, they came up with somewhat different totals. For instance, on March 2, 1976, one of the revenue agents counted 13 racks of red chips, 2 racks of green chips, and 14 racks of silver chips ($12,900) from the vantage point of the guest telephone. The other revenue agent counted 13 racks of red chips and 2 racks of green chips ($11,500) from the vantage point of the slot machines. The "surveillance memo" for that day states that the revenue agent standing at the slot machines "was unable to count the racks of Silver." Obviously, the agent standing at the guest telephone had a clearer view of the exchange and was able to make a more accurate count of the chips. That the lower count was made by the agent with the relatively worse view of the exchange indicates that any problems the agents experienced in their attempts to count the

---

[11]On those few days when there was a substantial difference between the revenue agents' count and the amount reportedly observed on the yellow sheets of paper, the revenue agents' count was always the lower one.

chips from a distance more than likely resulted in conservative counts rather than excessive ones.[12]

Petitioners also point out that the revenue agent's count of seven black chips ($700) on June 27, 1976, is contradicted by the casino's strict policy prohibiting dealers from taking black chips from the area of the gaming tables. See note 7 *supra*. Even assuming that the revenue agent mistakenly counted black chips on this one day, such an error would be insignificant. During the 48 surveillance days, the revenue agents counted tokes with a cash value totaling well over $300,000. Thus, the black chips counted on this one day represented far less than one percent of the total cash value of tokes counted during the entire surveillance project. Moreover, we find that any such error was more than offset by the fact that the revenue agents counted only the racks of chips they were able to identify clearly thereby resulting in the omission of not only loose chips, but on occasion, entire racks of chips.[13]

We also reject petitioners' assertion that the 48 surveillance days represented an insufficient sampling from which to forecast their toke income. Respondent selected the 48 surveillance days pursuant to a "stratified random sampling plan." That plan was designed to account for variations in toke income which generally occurred on different days of the week and at different times of the year. Only 25 percent of the surveillances took place on weekends when the toke rate was generally highest, and days on which special promotional events took place were also conservatively represented in the sampling. Although petitioners point out that there was a downward trend in the daily toke rate over the surveillance period, both parties' expert witnesses stated that this downward trend was not statistically reliable. Moreover, the record contains no evidence indicating a change in circumstances after 1976 which would support a finding that the dealers' toke

---

[12]Similarly, on Oct. 26, 1976, the revenue agent reported that the guest telephones were in use when the toke exchange took place. The revenue agent indicated he was unable to count all of the racks, and significantly, the value of his count was substantially lower than the amount he observed on the toke cutters' yellow sheet of paper.

[13]For instance, on Apr. 16, 1976, the revenue agent reported that several racks of silver chips were not placed on the counter of the cashier's cage and that he was therefore unable to count them. He also stated that there were several loose chips which he was unable to count.

rate was declining. Dealers' toke rates are generally a function of the volume of gambling, and there is no showing that the volume of gambling at Caesar's Palace diminished after the period of surveillance. Thus, we conclude under the circumstances of this case that the 48 surveillance days represented an adequate sampling from which to forecast petitioners' toke income for the years at issue.

Finally, we are convinced that respondent's application of a statistical confidence level of 95 percent offset any error which respondent might have made in reconstructing petitioners' toke income. Based on the raw data collected during the surveillance project, respondent determined that petitioners had an average daily toke rate of $71.69 during the 48 days of surveillance.[14] Nevertheless, respondent applied a confidence level of 95 percent and thereby reduced his determination of petitioners' average daily toke rate to $63.45. We are more than satisfied this reduction prevented any exaggeration of petitioners' toke income.

In summary, we find respondent's determinations are neither arbitrary nor excessive. Faced with the difficult task of reconstructing petitioners' income, respondent, in a thorough and professional manner, conducted an elaborate surveillance program designed to gather information directly bearing on such income. The dealers' daily exchange of tokes at the cashier's cage provided the revenue agents a unique opportunity to determine the amount of tokes received by the dealers on a particular day. Supplemented by records of dealers' work schedules obtained from Caesar's Palace, this information permitted respondent to make reasonable reconstructions of petitioners' toke income. Moreover, respondent's application of a confidence level, among other factors, indicates that these reconstructions were, if anything, conservative. Accordingly,

---

[14]On several occasions, the use of an average tip figure has been upheld without requiring the application of a confidence level. *Cracchiola v. Commissioner*, 643 F.2d 1383 (9th Cir. 1981), affg. a Memorandum Opinion of this Court; *Meneguzzo v. Commissioner*, 43 T.C. 824 (1965); *Mendelson v. Commissioner*, 305 F.2d 519 (7th Cir. 1962), affg. a Memorandum Opinion of this Court. See *Lum v. Commissioner*, T.C. Memo. 1981–89, on appeal (9th Cir., Oct. 27, 1981); *Castorina v. Commissioner*, T.C. Memo. 1981–87; *Powers v. Commissioner*, T.C. Memo. 1981–69, on appeal (9th Cir., Oct. 13, 1981).

we sustain respondent's determinations of petitioners' toke income for the years at issue.[15]

## II. Negligence

Respondent also determined that petitioners are liable for additions to tax under section 6653(a) for the relevant years. Section 6653(a) provides for an addition to tax where any part of an underpayment is due to negligence or intentional disregard of rules and regulations. The burden of proof is on petitioners to show that the additions were improperly imposed. *Enoch v. Commissioner*, 57 T.C. 781 (1972). Section 6001 and the regulations thereunder require petitioners to keep adequate records. The record clearly shows that petitioners unjustifiably failed to maintain adequate records of their toke income during each year in issue; thus, we sustain respondent's determinations of additions to tax under section 6653(a).

To reflect the foregoing and respondent's concession in docket No. 4480–81,

> *Decision in docket No. 4480–81 will be entered under Rule 155, and all other decisions will be entered for respondent.*

---

[15]Petitioners' contention that a substantial portion of their toke income represented gambling winnings which may be offset by gambling losses is unsupportable. It is clear from the record that any amount placed as a bet by the player for the dealer (see note 5 *supra*), remained under the player's control until the winnings, if any, were given to the dealer. Until that time, the dealer had no claim to the "toke." In fact, a player was free to take back a winning bet he had placed for the dealer. Moreover, Caesar's Palace prohibited its dealers from placing a bet at his own table or anywhere else in the casino. In view of these facts, we conclude that all tokes received by petitioners are taxable gratuities. See *Williams v. Commissioner*, T.C. Memo. 1980–494. In any event, even assuming a portion of petitioners' toke income represented gambling winnings, petitioners have failed to show they incurred gambling losses which they could offset against any such winnings.